NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2391
_____

UNITED STATES OF AMERICA

v.

ANTHONY LAMAR WILLIAMS,
a/k/a TONE

Anthony Williams,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-11-cr-00223-001)
Honorable Gene E. K. Pratter, District Judge

_____

Submitted under Third Circuit LAR 34.1(a)
October 24, 2014

BEFORE: FUENTES, GREENBERG, and COWEN, Circuit Judges

(Filed: October 31, 2014)
_____

OPINION*
_____

GREENBERG, Circuit Judge.

I. INTRODUCTION

_____

*This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Appellant Anthony Williams organized and managed a broad conspiracy to acquire and misuse the personal identification and banking information of dozens of victims in acts constituting access device and bank fraud, among other offenses. The conspiracy cost its victims over $1.8 million dollars before the conspirators were arrested and indicted. Williams now appeals from his conviction for conspiracy, access device fraud, identity theft, and bank fraud. Having exhausted the efforts of two court-appointed attorneys in the District Court and regarding their representation to have been unsatisfactory, Williams is proceeding pro se on this appeal.

On April 12, 2011, a grand jury indicted Williams for conspiracy to commit access device fraud and bank fraud, in violation of 18 U.S.C. § 371 (Count 1); 13 counts of access device fraud, and aiding and abetting, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (Counts 2-14); three counts of bank fraud, and aiding and abetting, in violation of 18 U.S.C. §§ 1344 and 2 (Counts 15-17); three counts of aggravated identity theft, and aiding and abetting, in violation of 18 U.S.C. §§ 1028(A)(1) and 2 (Counts 18-21); and one count of identity theft, and aiding and abetting, in violation of 18 U.S.C. §§ 1028(a)(7) and 2 (Count 22). The indictment charged 15 other individuals with various offenses arising out of the conspiracy. All of Williams' co-defendants pleaded guilty and have been sentenced and none has appealed.

Williams' trial commenced on November 27, 2012. On December 6, 2012, the jury convicted Williams of conspiracy, nine counts of access device fraud, the three bank fraud counts, and all of the identity theft counts. He advances both legal and procedural claims on this appeal, some of which he did not raise in the District Court. He contends

2

that he was prejudiced when the Court denied his motions to dismiss the indictment on the ground that he had been denied counsel and that his constitutional and statutory right to a speedy trial had been infringed. Williams next attacks the validity of his conspiracy conviction, and argues that the access device fraud and identity theft counts did not allege facts sufficient to enable him to prepare a defense. He goes on to argue that there was a prejudicial variance between the evidence at trial and offenses charged in the indictment, the government constructively amended the indictment, and the Court erred in charging the jury and in denying the jury's request for a transcript of certain testimony during its deliberations. Finally, he claims that the Court erred in determining the amount of the loss attributable to him, in applying a two-level sentencing enhancement for obstruction of justice, and in assessing criminal history points on the basis of his state conviction for fraud in New Jersey in 2010. We address each of his arguments. Although many of them have been waived or not preserved, we address the merits of each argument. We find all of them to be groundless. For the reasons we will set forth, we will affirm the judgment of conviction and sentence on all counts.

## II. PROCEDURAL AND FACTUAL HISTORY

Williams led a complex conspiracy to obtain and use personal identification information and credit account information to acquire bank cards and checks illegally in order to fraudulently obtain cash advances and purchase merchandise. Williams acted and directed others to act to obtain the account and identification information, and pose as valid account holders in order to add additional names to various accounts. Williams

3

directed the shipment of new cards to various addresses under his control, including numerous Federal Express facilities, and organized the interception of certain other deliveries to residences. Williams directed the use of the fraudulent cards, instructing co-conspirators to obtain cash advances or purchase merchandise. Williams and the other participants divided the proceeds of these transactions but it seems clear that he received the largest share of the illegally obtained proceeds.

Similarly, Williams orchestrated a fraudulent scheme to obtain bank account numbers and identification information to obtain additional checks on strangers' bank accounts. As was the case with the fraudulent cards, Williams changed the address or phone number of existing accounts and ordered checks in the name of account holders. Williams arranged for checks to be shipped to controlled addresses and to have packages intercepted before they were delivered. Williams prepared the checks and signed the account holder's name, directed other conspirators to recruit individuals to cash the fraudulent checks at various banks, and disbursed the proceeds of each successful transaction among a group of conspirators.

Williams evidently recognized that his scheme could be uncovered leading to his apprehension, so he cautiously took steps to avoid that fate. Thus, he did not meet personally with several of the members of the conspiracy so that they could not identify him if they were arrested. Co-defendant Nathaniel Whitfield, however, did meet Williams, and testified at length at the trial regarding details of the access device, identity theft, and bank fraud schemes. Whitfield explained that he obtained cash advances and made purchases using fraudulent cards that Williams put in Whitfield's name, and

4

described how Williams prepared and signed fraudulently obtained checks. Williams used hotel and library computers to pull up documents bearing the account holders' signatures and then practiced signing each signature until it mirrored the original. Whitfield described how he recruited several individuals to steal personal identification information, which other conspirators used to obtain credit reports. Williams used the information to call the banks or credit card companies and request additional cards under other names, providing various reasons for the account change.

Another conspirator, Timeeka Loud, testified that Williams recruited her to obtain credit reports. Williams provided personal identification information, which Loud used to search various websites and obtain additional information giving her access to credit reports. Loud ran credit reports and provided the information to Williams, who used it to access the accounts. Loud was present when Williams called banks to request additional checks or cards, and witnessed Williams changing addresses on some accounts and adding additional account holders on others. Loud recruited Aminah Holmes and Jennifer Pearson to obtain and provide personal identification information. When Pearson told Loud that she also could get checking account numbers, Loud put her in touch with Williams.

Effie Bilal, who was not charged in this case with an offense but was charged separately, testified that she was working at Keystone Mercy/AmeriHealth in 2009 when a friend asked her if she could obtain personal identification profiles. Bilal, who had access to the personal identification information of doctors and nurses, agreed to do so. About two weeks later, a man who identified himself as "Bossy," actually Whitfield,

5

called her and asked if she would provide personal profiles. When she said yes, Whitfield arranged for her to speak with an individual named "Wayne." Wayne called her to set up a meeting, at which she gave him profiles in exchange for $100. She provided profiles to Wayne on four or five occasions and received $100 each time. He told her he was using the information to get new bank cards. Bilal later identified Williams as the person she knew as Wayne.[1]

Representatives of the targeted banking institutions testified with respect to the conspirators' activity at trial. Todd Swoyer, a Citizens Bank employee, explained that the bank initiated an investigation after several customers complained about fraudulent checking account activity. The bank reviewed the phone calls that it received in connection with the activity and found that the same person appeared to make the calls regarding the different accounts. The caller would change the address and phone number on the account, and a fraudulent check drawn on the account would be cashed shortly thereafter. Videos showed that a small group of people were cashing the checks. The bank identified two employees – Jennifer Pearson and Brian Wright – who had accessed or monitored these accounts. Representatives of Barclays Bank, Citibank, Wells Fargo, TD Bank, check issuer Harland Clark, and Discover Card also testified about unauthorized activity on the compromised accounts, and several of the victim account holders personally testified that they had not ordered additional cards or checks and had not authorized the transactions made on their accounts.

---

[1] Another conspirator, Courtney Carr, acted through her boyfriend and gave personal profiles to a member of the scheme who promised to pay her $1,000 for the information. She never received any money and did not take any additional profiles.

There was other evidence supporting Williams' conviction at the trial. Thus, there was evidence that 136 calls had been made to the various banks in furtherance of the conspiracy and Whitfield and Loud were able to identify Williams as a participant in the calls. A postal inspector testified that he had repeated encounters with Williams and found items in Williams' possession at the time of his arrest, including two envelopes containing victims' personal identification information, copies of legitimate bank checks of two victims, credit reports, an online banking password for one victim, a Travelodge survey in a victim's name, a Travelodge key card, and two cell phones which contained numbers used to access bank accounts as well as general bank numbers.

At the close of the government's case, Williams moved for a judgment of acquittal on all counts. Williams argued that the access device fraud counts were defective because they failed to set forth facts sufficient to enable him to prepare a defense but the District Court denied Williams' motion. After the jury convicted Williams of conspiracy, nine counts of access device fraud, the three bank fraud counts, and all of the identity theft counts, the Court sentenced him to a total of 259 months imprisonment: 235 months on the bank fraud counts and a consecutive sentence of 24 months on the aggravated identity theft counts. In addition, the Court imposed lesser concurrent sentences on the access device and conspiracy counts. The Court also imposed a five-year period of supervised release, a special assessment of $1,900, and ordered Williams to pay restitution in the amount of $348,366.73. A judgment of conviction and sentence was docketed on April 25, 2013.

Williams has filed a timely appeal, proceeding pro se.

7

### III.  JURISDICTION

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction to review the final judgment under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

### IV.  STANDARD OF REVIEW

When reviewing a motion to dismiss an indictment, we exercise plenary review over a district court's legal conclusions.  See United States v. Huet, 665 F.3d 588, 594 (3d Cir. 2012).  Our inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979) (emphasis in original).  The "verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'"  United States v. Caraballo-Rodriguez, 726 F3d, 418, 431 (3d Cir. 2013) (en banc), quoting Coleman v. Johnson, 132 S.Ct. 2060, 2065 (2012).

In this case, during deliberations the jury requested that it be given written transcripts of certain testimony and the District Court, in a decision Williams challenges on this appeal, denied that request without Williams being present when the Court made its ruling.  We review that decision for an abuse of discretion, see United States v. Bertoli, 40 F.3d 1384, 1400 (3d Cir. 1994), and consider the circumstance that the Court made its ruling without Williams being presented on a plain error basis.  See United States v. Romero, 282 F.3d 683, 689 (9th Cir. 2002).  We exercise plenary review of an interpretation of the Sentencing Guidelines, and review the Court's factual findings for

8

clear error.  See United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).


## V.  DISCUSSION

### A.  The District Court Did Not Err in Denying Williams' Motions to Dismiss the Indictment

Williams contends that the District Court erred by denying his motions to dismiss the indictment on the ground that he was denied counsel and had been denied his speedy trial rights.  He argues that his Sixth Amendment right to counsel was violated because he was "completely denied" counsel for five months after his arraignment, and "constructively denied" counsel until the Court appointed new counsel for him seven months later.  He claims that he was prejudiced by this lack of counsel because he was unable to assert speedy trial rights, obtain witnesses favorable to his defense, and object to a protective order that the Court entered that limited his access to certain information. Williams posits that the Court further erred by refusing to replace counsel when he first complained about that counsel's representation of him at a hearing held in March 2012. We conclude that Williams' arguments are entirely unpersuasive and we will affirm the Court's decision to deny Williams' motions to dismiss the indictment on the ground.

The record evidences that Williams was represented by counsel from the time of his arraignment until new counsel was appointed approximately 12 months later. Therefore, it may be appropriate to style Williams' argument as raising a claim that he had ineffective assistance of counsel, as his brief details a deep dissatisfaction with his initial trial counsel's frequency of communication with him in the period after the

9

indictment, and details his frustration with counsel's inability to provide him with discovery materials that he desired. The District Court first reviewed Williams' complaints regarding counsel at a hearing on March 7, 2012, at which it allowed two months for Williams and his counsel to resolve their differences. When Williams again moved to dismiss counsel two months later, his counsel concurred in this request, and the Court appointed new counsel.

We find that the District Court did not err in refusing to dismiss the indictment on the ground that counsel's performance was constitutionally deficient. Despite Williams' complaints, the record shows that he did not cooperate with his attorney and demanded materials that counsel could not provide because of the restraints of the protective order. Williams also fails to demonstrate "some adverse consequence to the representation [the defendant] received or to the fairness of the proceedings leading to [his] conviction." United States v. Morrison, 449 U.S. 361, 363-64, 101 S.Ct. 665, 667 (1981). As Morrison held, absent demonstrable prejudice, "dismissal of [an] indictment is plainly inappropriate, even though the violation may have been deliberate." Id. at 365, 101 S.Ct. at 668. Williams cannot claim plausibly that he lost the opportunity to assert a speedy trial claim, as he raised this issue both before and after the appointment of new counsel and the parties argued regarding the point fully in the District Court. He posits that counsel's behavior rendered him "automatically" exposed to consecutive state and federal sentences because he was unable to request a transfer to federal custody before he was sentenced on his separate New Jersey state fraud conviction, but his claim is fundamentally flawed inasmuch as his claimed inability to request his transfer did not

10

"automatically" expose him to consecutive sentences in state and federal courts because the District Court had the option of running the federal sentence concurrently to the state sentence. U.S.S.G. § 5G1.3. We find that the Court properly refused to dismiss the indictment on the basis of his claim that counsel had been denied or that he had an ineffective counsel.

We further determine that the District Court properly denied Williams' motion to dismiss the indictment for alleged violations of his statutory and constitutional speedy trial rights. The Speedy Trial Act requires that a defendant be brought to trial within 70 days from the date of the information, indictment, or arraignment, whichever occurs last. 18 U.S.C. § 3161(c)(1). The Act also provides that certain "periods of delay shall be excluded in computing the time within which . . . the trial of any such offense must commence." 18 U.S.C. § 3161(h). Periods of excludable delay include "ends of justice" continuances, as well as the filing of pretrial motions, which "automatically" operate to "stop[] the Speedy Trial clock from running." United States v. Tinklenberg, 131 S.Ct. 2007, 2012-13 (2011); 18 U.S.C. § 3161(h)(1)(D).

Pursuant to the Act, the District Court properly excluded certain days between Williams' arraignment and his trial. Williams, however, proposes a more creative calculation. First, he claims that the time between his arraignment on May 17, 2011, and his counsel's filing of the motion for a continuance of the trial date on November 3, 2011, should not be excluded in a computation of the time for trial because he was denied counsel during this period. For the reasons we discussed above this claim is meritless. Williams argues further that the Court incorrectly excluded the period between the

11

originally scheduled trial date of November 14, 2011, and the March 7, 2012 hearing. The Court entered an order on June 30, 2011, extending the trial date so that it could exceed the 70-day period so as to allow counsel adequate time to prepare for trial, and set the trial date for November 14, 2011. Williams seems to overlook the Court's order of November 8, 2011, which excludes the days from the filing of Williams' and co-defendant Loud's motions to continue the trial date "until such time as a hearing on said motions is concluded or other prompt disposition is made." App. 204. Williams asserts that this period should not have been excluded because the Court did not grant an "ends of justice continuance" at this time, and the 70-day period expired before it did so.

We reject Williams' reasoning on this point. The Act excludes delays resulting from the filing of a pretrial motion through the prompt disposition of such motion, 18 U.S.C. § 3161(h)(1)(D), and thus the District Court properly excluded the period. Moreover, Williams ignores the circumstance that counsel based his motion for a continuance on a representation that he needed additional time to determine whether a non-trial disposition of the case could be negotiated, or, in the alternative, needed time for preparation for trial. The motion specifically referenced Section 3161(h)(7)(A), which excludes any period of delay resulting from a continuance granted by a court on its own motion or at the request of the defendant or his counsel "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The Act recognizes that such a continuance may be granted in order to allow the defendant "reasonable time to obtain counsel," to allow for "continuity of counsel," or to allow the

12

parties "reasonable time necessary for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h)(7)(B)(iv). It is also proper to allow an ends-of-justice continuance to allow defense counsel time to work for a non-trial resolution of the case. United States v. Fields, 39 F.3d 439, 445 (3d Cir. 1994).

The District Court expressly recognized the reasons for the continuance at the hearing on March 7, 2012. At that hearing, the Court concluded that additional time was necessary to allow Williams and his attorney to prepare for trial, and ordered that the trial start on May 16, 2012, then at a hearing on May 8, 2012, Williams again asked the Court to appoint new counsel, and acknowledged that a change in counsel would necessitate a continuance of the trial date. When agreeing to a new trial date of November 27, 2012, he expressly agreed to waive his speedy trial rights. In denying the motion to dismiss the indictment, the Court repeated these reasons and cited Section 3161(h)(7).

Thus, although the District Court did not explicitly reference Section 3161 or the "ends-of-justice" at the March status hearing, it is clear that the Court was granting a continuance on the basis of Section 3161(h)(7). A district court is not required to cite sections of the Act or to track the statutory language where it makes contemporaneous findings sufficiently specific to justify a continuance under the provisions of the Act. See United States v. Rivera Const. Co., 863 F.2d 293, 297 (3d Cir. 1988) (holding that a district court must grant a continuance before the 70-day period had run, but is not required to put its reasons on the record at that time and a subsequent articulation satisfies the purpose of the statute). Accordingly, the period from the filing of the motion for a continuance to the hearing on the motion was excluded properly from the speedy trial

13

calculation, as was the period from the March hearing until the trial started.

The District Court carefully considered the relevant Barker factors before denying Williams' motion to dismiss the indictment for an alleged violation of his speedy trial rights; it examined the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192 (1972). The Court first concluded that the 19-month delay in this case was not a circumstance weighing in Williams' favor. See Hakeem v. Beyer, 990 F.2d 750, 760-61 (3d Cir. 1993) (a delay of 14½ months did not weigh in defendant's favor without proof of substandard conditions or other oppressive factors); United States v. Ruth, 413 F. App'x 439, 442 (3d Cir. 2010) (not precedential) (16-month delay was not unreasonable and did not weigh in favor of the defendant). The Court then found that the reason for the delay did not weigh in Williams' favor, as the defense sought the continuances and in the consideration of a speedy trial contention a delay attributable to the defense should be weighed against the defendant, and any delays attributable to the defendant's counsel are charged against the defendant. Vermont v. Brillion, 556 U.S. 81, 90-91, 129 S.Ct. 1283, 1290-91 (2009) (an attorney acts as the defendant's agent); New York v. Hill, 528 U.S. 110, 114-15, 120 S.Ct. 659, 663-64 (2000). Moreover, Williams did not assert his speedy trial rights consistently; he acquiesced to continuances generated by his own requests for substitute counsel. See United States v. Loud Hawk, 474 U.S. 302, 314, 106 S.Ct. 648, 665-66 (1986) (although defendant repeatedly asserted his speedy trial right, "[t]hese assertions . . . must be viewed in the light of [his] other conduct").

14

Finally, the District Court reasonably determined that Williams failed to demonstrate that he was prejudiced by the delay. See Barker, 407 U.S. at 530, 92 S.Ct at 2192. A defendant can establish prejudice by showing that he was subject to "oppressive pretrial incarceration," that he suffered "anxiety and concern" about the impending trial, or that the delay impaired his ability to defend against the pending charges. Hakeem, 990 F.2d at 762. Williams was not subject to oppressive pretrial delay as a result of his prosecution, as he was detained at the time of his initial appearance as a result of the prosecution in New Jersey and was sentenced in that case in August 2011. He was not prejudiced by the loss of certain witnesses, as it is clear that all but one of them already were unavailable at the time that counsel moved for a continuance of the trial date.[2] See id. at 760 (prejudice cannot be inferred from testimony that became unavailable before the point of a contested delay). Given the reasonable delay in bringing Williams to trial, his own role in creating this delay, his inconsistent efforts in seeking a speedy trial, and his failure to show prejudice, we determine that the Court did not err in denying Williams' motion to dismiss the indictment on constitutional speedy trial grounds.

> B.     Williams Did Not Preserve his Right to Challenge the Sufficiency of the Indictment, Which Fails on Plain Error Review.

Williams contends that all of the counts in the indictment are defective and thus his conviction should be set aside and the indictment dismissed. Williams asserts that the conspiracy count, which charges him with participating in a conspiracy to commit access

[2] By Williams' own admission, a witness, Ware, died one month after Williams' initial appearance in this case, witnesses Wilson and Foreman died before the November 3 request for a continuance, White died in December 2011, and Williams' brother, John Williams, "disappeared" in November 2011.

15

device fraud and bank fraud, fails to allege the offense of conspiracy to commit bank fraud. He further contends that the substantive access device counts (Counts 2-3, 5-12) and identity theft counts (Counts 18-22) are defective because they fail to allege facts sufficient to enable him to prepare a defense. Our review of the record satisfies us that Williams did not raise these claims prior to trial. As a result, we determine that he has not preserved any of these claims except his claim that Count I fails to state the offense of conspiracy to commit bank fraud. Nonetheless, we address the merit of each argument, finding that they are not meritorious. See Fed. R. Crim. P. 12(b)(3)(B) and (e); United States v. Panarella, 277 F.3d 678 (3d Cir. 2002).

We begin this discussion by recognizing that it is unfair to the government when a defendant brings a post-trial attack on the sufficiency of the indictment and that a court, when entertaining such challenge, should construe the factual allegations in the indictment liberally in favor of its validity. United States v. Vitillo, 490 F.3d 314, 324 (3d Cir. 2007). When entertaining such an attack, a court must uphold the indictment "unless it is so defective that it does not, by any reasonable construction, charge an offense." Id. at 324 (citation omitted).

1.      Count I Properly Charges A Conspiracy To Commit An Offense In Violation Of Section 371.

Williams argues that Count I of his indictment does not sufficiently allege the crime of conspiracy to commit bank fraud because it does not specifically allege that there was an agreement and specific intent to commit bank fraud. His argument is not well founded as it is well settled that an indictment charging a conspiracy under 18

16

U.S.C. § 371 need not specifically plead all of the elements of the underlying substantive offense. United States v. Werme, 939 F.2d 108, 112 (3d Cir. 1991); United States v. Wander, 601 F.2d 1251, 1258 (3d Cir. 1979). A conspiracy count only need put defendants on notice that they are being charged with a conspiracy to commit the underlying substantive offense. Werme, 939 F.2d at 112.

The conspiracy count met this criterion. Count I of the indictment charges that Williams conspired to commit an offense against the United States in violation of 18 U.S.C. § 371, describing two objects of that offense: access device fraud, in violation of 18 U.S.C. § 1029(a)(2), and a scheme to defraud financial institutions and obtain funds by false representations, in violation of 18 U.S.C. § 1344. The indictment further charges that Williams and his co-conspirators conspired to obtain stolen identification information and credit card numbers, used that information to obtain additional cards in various names, and used the fraudulent cards to obtain cash advances on the accounts and to purchase merchandise. It lists several overt acts, describing instances in which co-conspirators used fraudulent credit cards to obtain cash advances and to purchase merchandise. Count I of the indictment sufficiently alleged the crime of conspiracy to commit bank fraud.

Williams next claims that the indictment was deficient because it failed to allege that overt acts of bank fraud had been committed. We point out that this claim is one of factual sufficiency and has not been preserved, as Williams did not raise the issue before the District Court. Moreover, even if it is considered on the merits, this claim fails. The indictment alleged that there was an agreement to obtain money from banks by false

17

pretenses, that is, by using fraudulent credit cards, some on the basis of bank authorization, to obtain cash advances. It further alleged that the conspirators used fraudulent Barclays Bank cards to obtain or attempt to obtain cash advances from Bank of America on two occasions and from Sovereign Bank on another occasion. It goes on to allege that a conspirator used a Discover card to obtain cash advances from Sovereign Bank and from Citizens Bank. The indictment properly alleged that there had been overt acts of bank fraud; the factual allegations were sufficient to permit Williams to prepare his defense and to invoke a double jeopardy defense in the event of a subsequent prosecution for the same offenses.[3]

2. Count I Is Not Impermissibly Duplicitous.

Williams claims that Count I is defective because it is improperly duplicitous. In considering this claim we initially point out that Williams did not raise this claim prior to trial and accordingly did not preserve the claim. In any event, the claim lacks merit. "Duplicity is the joining of two or more distinct offenses in a single count, so that a general verdict does not reveal exactly which crimes the jury found the defendant had committed." United States v. Gomberg, 715 F.2d 843, 845 (3d Cir. 1983). A count of a conspiracy to commit several crimes, however, is not duplicitous as it is well settled that "'[t]he conspiracy is the crime, and that is one, however diverse its objects.'" Gomberg,

---

[3] The fact that the compromised credit cards identified in the overt acts were also the subject of access device fraud counts does not alter this conclusion, as the use of an unauthorized credit card to make cash withdrawals from a bank may constitute both bank fraud and access device fraud. In an assessment of the sufficiency of the conspiracy count, it is not material that these specific transactions were not included in the substantive bank fraud counts.

715 F.2d at 845-46, quoting Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 182 (1942). The conspiracy count charged one conspiracy that had two different criminal objectives – bank fraud and access device fraud – a fact which the District Court made clear when it instructed the jury. Williams' claim of duplicity fails.

### 3. The Access Device Fraud Counts Set Forth a Sufficient Factual Basis

Williams contended for the first time in his Rule 29 argument at the close of the government's case that the access device fraud counts lacked facts sufficient to enable him to prepare a defense. In view of this delay, Williams did not preserve this argument but we nevertheless consider and reject it on the merits.

As we already have explained, an indictment is sufficient if it presents a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Here, the access device counts track the language of the statute and include the factual allegations necessary to identify the particular fraudulent transactions, including dates, initials of victim card holders, and the last four digits of compromised credit cards. 18 U.S.C. § 1029(a)(2). These details sufficiently informed Williams of the specific allegations against him and allowed him to prepare a defense to the charges. Williams' claim that these allegations were so vague that they gave the government opportunity to proceed on any theory and present whatever evidence it chose at trial is baseless.[4]

---

[4] Williams' reliance on United States v. Schmitz, 634 F.3d 1247 (11th Cir. 2011), is misplaced. The indictment in that case charged Schmitz with four counts of theft from a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A). The court held

4. The Identity Theft Counts Were Factually Sufficient.

Williams claims, without substantive argument, that the indictment's identity theft counts are deficient because they "contain no facts and are to [sic] confusing to allow him to prepare a defense." Appellant's br. 27. We, however, find the language of the counts at issue quite clear, and not markedly dissimilar from the other counts, and thus conclude that if the formulation of the counts confused Williams he could have sought clarification of the indictment by reviewing the statute and the charges against him. 18 U.S.C. § 1028(A)(1). We also note that Williams did not raise the claim until this appeal and he therefore did not preserve this claim. More importantly though, these counts tracked the statutory language and specified the identifications that the charged defendants possessed on the date or dates in question. Accordingly, we determine that the indictment clearly provided Williams with information enough to prepare a defense.

C. No Prejudicial Variance Existed Between the Bank Fraud Indictment Charge and Trial Evidence.

Williams argues for the first time on appeal that there was a prejudicial variance between the evidence presented at trial and the bank fraud offenses charged in the indictment, and this variance "constructively amended" the charges in the indictment (Counts 15-17). Appellant's br. 28-30. In considering this contention, we point out that because Williams did not raise this claim in the District Court, we review it for plain

that the program fraud counts were legally deficient because they did not allege facts or circumstances that informed the defendant of the specific charges, and the mail fraud allegations could not be consulted because the government did not expressly incorporate these allegations in the program fraud counts. 634 F.3d at 1261-62. Here, in contrast, the access device counts contained specific facts informing Williams of the charges.

20

error.  United States v. Daraio, 445 F.3d 253, 259 (3d Cir. 2006).  There is a variance when the terms of the indictment "are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment."  Id. at 261.  "[A] variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense."  Id. at 262.  A variance does not prejudice a defendant's substantial rights if: (1) the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be surprised at trial; or (2) the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense.  Id.

Williams contends that the evidence impermissibly varied from and constructively amended the indictment because the indictment alleged that a certain employee of the Penn Mutual Insurance Company provided stolen identification information used to cash fraudulent checks, but evidence at trial established that a different individual provided the information.  He further contends that the evidence varied impermissibly because even though the indictment alleged that Courtney Carr and another individual provided stolen account information to Amina Holmes and Timeeka Loud, there was no evidence that Carr or Holmes knew Loud.  After our study of the record, we find that the trial transcript speaks for itself.  Williams cannot reasonably claim that he was surprised by any evidence relating to these counts, and any argument that the evidence presented varied impermissibly from and constructively amended the indictment is not substantial as Williams' contentions are factually inaccurate.  The evidence supporting Counts 15, 16, and 17 was well-presented and thorough, and certainly supported the allegations of the

21

indictment. Id. at 261. There was no variance, prejudicial or nonprejudicial, between the bank fraud counts and trial evidence.

D. The Evidence at Trial Did Not Constructively Amend the Indictment.

In an argument related to the variance argument, Williams asserts that the government constructively amended the indictment during trial by introducing evidence regarding people and events not specifically mentioned in the indictment. An indictment is constructively amended when "evidence, arguments, or the district court's jury instructions 'broaden[s] the possible bases for conviction from that which appeared in the indictment.'" United States v. McKee, 506 F.3d 225, 229 (3d Cir. 2007), quoting United States v. Lee, 359 F.3d 194, 208 (3d Cir. 2004). There may be an amendment when the evidence or jury instructions at trial "modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." Daraio, 445 F.3d at 259-60. Inasmuch as Williams did not raise this constructive amendment contention in the District Court, we review it for plain error and conclude that his argument fails on its merits.

Williams' argument appears to rest on the view that reference to all evidence introduced at trial must be contained in the underlying indictment. Of course, the law does not include any such requirement. As noted above, an indictment must contain only a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The government is not required to include in

22

the indictment all of the information at its command so as to present "a fully integrated trial theory for the benefit of the defendant."  United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1971).  But Williams apparently believes that an indictment should be so detailed because he objects to trial testimony of evidence omitted from the indictment.  However, none of the evidence cited by Williams to which he objects broadened the bases for conviction.

Williams further contends that certain evidence at trial impermissibly broadened the charges against him regarding the access device counts in that it proved only that he "trafficked" in access device cards, not that he abetted the use of unauthorized access devices.  Williams ignores the evidence showing that he was present when fraudulently obtained credit cards were used to purchase merchandise, and ignores testimony demonstrating that he directed others to use the cards to obtain cash advances and/or merchandise and to recruit others to do so.  The presentation of that evidence did not constructively amend the charged access device counts, and we, accordingly, reject Williams' contentions to the contrary.

        E.      The Trial Evidence Sufficiently Supports Williams' Conviction on the Access Device, Bank Fraud, and Identity Theft Counts.

Williams contends that the evidence was insufficient to support convictions on the access device, bank fraud, and identity theft counts.  In considering this point, we examine whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. at 318-19, 99 S.Ct. at

23

2789 (1979) (emphasis in original), and uphold the verdict as long as it does not "fall below the threshold of bare rationality." Caraballo-Rodriguez, 726 F3d at 431 (quoting Coleman v. Johnson, 132 S.Ct. 2060, 2065 (2012)(internal quotation marks omitted). We find overwhelming evidence of Williams' guilt on every count of conviction, even though he does not seem to acknowledge that this evidence had been introduced at the trial in his brief. His arguments to the contrary are completely meritless.

First, with regard to the access device fraud counts, the government was required to prove that Williams: (1) knowingly used an unauthorized access device; (2) with the intent to defraud; (3) to obtain anything having an aggregate value of $1,000 or more over the course of a one-year period; and (4) the use of the access device affected interstate commerce. The trial testimony, government's brief, and accompanying portions of the record detail the extensive evidence presented by cooperating witnesses and bank officials, and phone recordings and other materials, on which the jury could rely to find guilt. For example, codefendant Nathaniel Whitfield testified that Williams was the leader of the scheme and directed others, including Whitfield, to obtain credit card account information. Williams used the information to obtain credit reports and order additional cards on those accounts in various names. Williams directed others to obtain cash advances or buy merchandise with the fraudulently obtained cards. Additional testimony demonstrated that Loud obtained credit reports for Williams, who used the reports to obtain additional credit cards or checks.

Williams' challenge to the bank fraud convictions similarly is lacking in merit. He claims that the evidence on the bank fraud counts is insufficient to support his conviction

24

because the government failed to prove that he possessed the requisite intent required for a conviction, and failed to prove that his phone calls to the banks were "material" to the fraudulent transactions. His claims seem to ignore the trial proceedings. The trial record evidences that the government demonstrated Williams' specific intent to defraud the banks. See United States v. Thomas, 315 F.3d 190, 197 (3d Cir. 2002).[5] Testimony of bank employees and co-conspirators demonstrates that Williams used stolen account information to call the banks and order additional checks on the compromised accounts by falsely representing that he was the account holder and giving various false reasons for the changes to the account or the need for the additional checks. He directed other conspirators to recruit persons to cash the fraudulent checks and received a portion of the proceeds of each transaction. Government agents testified that Williams possessed copies of legitimate checks of identified victims at the time of his arrest. A rational juror could have reviewed the evidence and found that he had the requisite intent to support his conviction. See Jackson, 443 U.S. at 318-19, 99 S.Ct. at 2789.

Likewise, the evidence sufficiently demonstrated that Williams' phone calls to the banks were "material" to the fraudulent transactions. Whitfield's and Loud's testimony, corroborated by testimony of bank personnel, identified Williams as the speaker in many of the calls and evidenced how he used phone calls in conjunction with certain phone

---

[5] Notably, where banks are the "target[s] of deception," as they were here, there is no requirement that the government demonstrate that the defendant intended to harm the victim. See United States v. Khorozian, 333 F.3d 498, 505 (3d Cir. 2003) (bank is target of deception when it potentially negotiates counterfeit or fraudulent checks). Nonetheless, the trial evidence was sufficient to support the jury's conclusion that Williams acted with specific fraudulent intent.

numbers, addresses, and shipping methods to accomplish the bank fraud.[6]

Ultimately, viewing the evidence in the light most favorable to the prosecution, we determine that a rational juror could have found that the essential elements of the crimes charged in the access device, bank fraud, and identity theft counts were proven beyond a reasonable doubt and, accordingly, we will uphold the verdict on all of these charges.

### F. The District Court Properly Instructed the Jury on the Conspiracy and Bank Fraud Counts.

Williams asserts next that the District Court improperly instructed the jury by failing to inform it of the overt acts alleged in the conspiracy count and the false representations alleged in the bank fraud counts.  Once again Williams raises an argument that he did not raise in the District Court and thus our review is for plain error. Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." ).  We determine that his claim fails; we see no plain error in the Court's instruction on this point.  Moreover, in the light of the prosecution's articulation of the overt acts and false representations in question during closing argument, any error on this issue would have been harmless.

An appellate court when reviewing jury instructions examines the entire charge to

---

[6] We note that in a single sentence of his brief, Williams contends that the evidence was insufficient to sustain his conviction on the identity theft counts.  Appellant's br. 40. Williams argues that the government failed to produce one of the victims referenced at trial and failed to present any evidence that he "possessed any identification to commit fraud."  We reject this argument.  The government was not required to produce every victim, and a rational trier of fact could have determined from ample evidence that Williams possessed stolen identification information for fraudulent purposes.

26

ascertain whether the district court performed its duties properly. United States v. Garrett, 574 F.2d 778, 781–82 (3d Cir. 1978). Therefore it is not surprising that the courts do not isolate a single jury instruction for evaluation; rather, they evaluate an instruction in the context of the overall charge as the jury would have heard the charge in that context. See Cupp v. Naughten, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400 (1973). A trial involves the consideration of the witnesses' testimony, counsels' arguments, the exhibits admitted into evidence, and the court's instructions to the jury. Therefore, "the process of instruction itself is but one of several components of the trial which may result in a judgment of conviction." Id. at 147, 94 S.Ct. at 400. A district court provides the jury with guidance, to enable it to draw the appropriate conclusions from the testimony. Garrett, 574 F.2d at 782. The court satisfies this duty by clearly articulating the relevant legal criteria. Id.; see also United States v. Goldblatt, 813 F.2d 619, 623 (3d Cir. 1987).

Williams correctly contends that the District Court did not identify to the jury the overt acts performed in furtherance of the conspiracy or supply it with a copy of the indictment for its use when it deliberated. The Court, however, specifically and correctly instructed the jury that the government was required to prove beyond a reasonable doubt that at least one member of the conspiracy performed a particular overt act in furtherance of that conspiracy and that the jury so concluded unanimously. The Court stated that it expected the government to link the evidence to the specific allegations in the indictment, and the prosecutor did so; in closing argument, the prosecutor identified each of the overt acts and described the supporting evidence. The prosecutor also reminded the jury that it must agree unanimously that a conspirator committed at least one particular overt act.

27

The Court did not need to identify the overt acts in order to give a proper instruction, and we find no plain error, or error at all, in the circumstance that the Court did not do so. See United States v. Norris, 419 F. App'x 190, 194-95 (3d Cir. 2011).

We find equally unpersuasive Williams' assertion that the District Court erred by not identifying the specific false or fraudulent representations at issue in relation to the bank fraud charges during jury instruction. See Goldblatt, 813 F.2d at 623. The Court instructed the jury on the law, emphasizing that its members must agree unanimously that there was at least one particular false representation. In closing argument, the prosecutor reviewed the fraudulent representations and acts charged in the indictment, citing the evidence that supported these allegations. So once again, the Court instructed the jury on the law while the prosecutor described the alleged offenses in closing arguments. We do not find plain error, or error at all, in the Court's jury instructions, which we would find proper regardless of our standard of review. See Kibbe, 431 U.S. at 154, 97 S.Ct. at 1736.

### G. The District Court Did Not Commit Plain Error in Ruling on the Jury's Request for Testimony Out of the Presence of Appellant.

Williams asserts that the District Court abused its discretion by denying the jury's request for Whitfield's and Loud's testimony to be supplied to it in transcript form because it did not state its reasons for denying the request on the record. Inasmuch as Williams' counsel did not object to the Court's ruling on the jury's request, and, in fact, agreed with the Court's disposition of the request, Williams has not preserved this issue on appeal. Nevertheless, we can consider the issue on a plain error basis. See United

28

States v. Boone, 279 F.3d 163, 174 n.6 (3d Cir. 2002). We find that the Court did not abuse its discretion in denying the jury's request for rereading of this testimony.

When the jury requested the testimony during deliberations, the District Court indicated that this "obviously can't be done." App. 1917. Any knowledgeable person understanding a court reporter's function and heavy workload who exams the docket in this case, would recognize that the trial testimony could not be prepared in transcript form until several months after trial. Experienced defense counsel was aware of this circumstance and did not object to the Court's response to the jury's request, though counsel did ask if Williams needed to be present for the discussion on the jury's request. The Court responded that it saw no need for Williams' presence because the issue fell squarely within its discretion, and did not raise a matter requiring that Williams and his attorney consult on the matter. The Court, though denying the request, advised defense counsel to inform Williams about the jury's request and the Court's response. The Court then called in the jury and responded that it was denying its request, adding that the parties agreed with the its decision.

A district court has broad discretion in deciding whether to grant a jury's request for the transcript of a witness' testimony or to have testimony read back. See Bertoli, 40 F.3d at 1400. This discretion is based on a limited, two-fold rationale: (1) that such requests may slow the trial where the requested testimony is lengthy; and (2) consideration of only a portion of the total testimony may cause the jury to give that portion undue emphasis. Id., citing United States v. Rabb, 453 F.2d 1012, 1013 (3d Cir. 1971). We respect the Court's exercise of discretion, and, even assuming that defense

29

counsel's assent to its decision to deny the request does not bar Williams from raising the issue on appeal, the Court surely did not commit plain error when it denied the jury's request. While the Court did not need to explain the basis for its decision because Williams, or, for that matter, the government did not object to it, we infer from its comment that the request to rehear the testimony "obviously can't be done" that the Court was referring to the fact that the transcripts were not available. It is significant that the jury did not request a reading of the testimony rather than being provided with a written transcript of the testimony because it probably would have been possible to have the reporter read the testimony. It is also significant that the Court also may have determined that the testimony of Loud and Whitfield was quite lengthy and an examination of the testimony clearly would have been a protracted undertaking.

In a related claim, Williams asserts that the District Court violated his constitutional right to be present at all stages of the trial by consulting with counsel and responding to the jury's request for testimony in Williams' absence. A violation of a defendant's right to be present at trial is ordinarily subject to harmless error review. United States v. Toliver, 330 F.3d 607, 612-13 (3d Cir. 2003). Where, as here, a defendant does not object through counsel to his absence during the proceedings, the defendant must show plain error in order to obtain relief on an appeal. Romero, 282 F.3d at 689.

The Supreme Court has stated that the "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow…." Kentucky v. Stincer, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667 (1987) (internal quotation marks omitted) (a

30

defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure) (internal quotation marks omitted).  In United States v. Toliver, we considered whether a defendant's Fifth and Sixth Amendment rights to counsel and to be present at every stage of trial were violated when the district court responded to a jury request without notifying either the defendant or defense counsel.  The jury requested to have the testimony of two witnesses on a certain point read, and the court sent an excerpt of the testimony to the jury.  330 F.3d at 609.  We concluded that the court's actions violated the defendant's Sixth Amendment right to counsel and his right to be present at trial, but held that violations of the right to be present are subject to harmless error analysis.  Id. at 612-13.  '[I]f there is no reasonable possibility of prejudice from the error, it is deemed harmless.'"  Id. at 612 (alteration in original) (quoting United States v. Alessandrello, 637 F.2d 131 (3d Cir. 1980)).  We concluded that the court's action in providing the transcript to the jury would be within its discretion even if the court consulted with counsel, and, in fact, the error in that case had been harmless.  Id. at 617.

Here, unlike in Toliver, Williams' counsel was present and agreed with the Court's proposed course of action.  But as the Court explained in observing that it would have taken the same action even if the defense objected, its decision to deny a jury's transcript request rested within its sole discretion.  Id.  The Court did not abuse its discretion in denying this request given the absence of transcripts and the context of the request.  Finally, we point out that Williams has not identified how the Court's decision prejudiced him.  We find that the Court did not err and that even if it had done so, the

31

error would have been harmless.

        H.     The District Court Properly Calculated the Applicable Guideline Range.

Williams' last contentions relate to sentencing as he contends that the District Court committed three errors in calculating his guideline range. We have considered these contentions and find them to lack merit.

1. The Court Did Not Err In Determining Loss.

The Probation Office determined that Williams' offenses involved a total intended loss of approximately $1.8 million, which triggered a 16-level enhancement in the Guidelines calculations. In its sentencing memorandum, the government stated that it identified 170 accounts that Williams and his co-conspirators compromised during the course of the conspiracy, and provided a chart listing all of the relevant information. At the sentencing hearing, however, Williams argued that the loss associated with Effie Bilal should not be included in this total because she was not charged in the indictment of Williams being tried. After confirming that the loss associated with Bilal was $560,000, the Court noted that even with an adjustment subtracting this amount from the loss, the loss still would have exceeded $1 million and the 16-level adjustment would apply. Even though Williams' counsel had no other objection to the loss total, after conferring with Williams, he objected to the inclusion of any relevant conduct that was not presented at trial.

Agent Ritter testified about the information contained on the summary chart, explaining that it included losses on accounts connected to Williams in various ways:

32

Williams called the financial institutions and made changes to the accounts; co-conspirators provided information to Williams regarding the accounts; and addresses for the accounts were changed to addresses associated with Williams. Despite this evidence, Williams argues that the Court erred by accepting the government's loss calculation. He claims that the government failed to play recordings of phone calls made to all of the issuing card companies at trial or at the sentencing hearing, and Ritter's loss determination was thus "unsubstantiated." Appellant's br. 50.

To the extent that Williams contends that the District Court was not legally permitted to rely on facts that the jury did not find in determining his guideline range, his claim fails. See Grier, 475 F.3d at 560-61 (3d Cir. 2007) (en banc). The Guidelines specifically permit consideration of all relevant conduct, and the government presented sufficient evidence with regard to the calls. U.S.S.G. § 1B1.3(a)(1)(A). Ritter explained that Loud, Whitfield, and law enforcement officers familiar with Williams' voice identified him as the caller on many of the calls, while Ritter himself listened to and identified Williams as the speaker on every call on which the loss chart relied. Altogether, the Court's loss findings were supported by a preponderance of the evidence, Williams was free to contest the evidence during trial but did not do so, arguing only at sentencing that the Court should not consider any evidence not presented at trial. We determine that the Court did not err in crediting Ritter's testimony about the phone calls or in accepting his well-supported loss calculation.

2. The Obstruction of Justice Enhancement Was Proper.

The government sought, and the Probation Office applied, a two-level

33

enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1, based on Williams' attempt to persuade relatives to forward a letter to Loud in an attempt to convince her to change her testimony against him. U.S.S.G. § 3C1.1 provides for a two-level adjustment where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction… ." Application note 4 to U.S.S.G. § 3C1.1 provides that the kind of conduct to which the adjustment is intended to apply includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness," "directly or indirectly, or attempting to do so."

At the trial, the government introduced transcripts of Williams' threatening prison telephone calls to his relatives and co-defendants, including Whitfield, whom Williams referred to as a "rat." Williams objected to the government's evidence, arguing that he did not ask Loud not to testify but only told her to assert a speedy trial defense. Williams later admitted that his mother in a conversation with him told him that he wanted her to send a letter to Loud that amounted to "coercion" and she would not send it.

The District Court found that Williams had attempted to obstruct justice and applied the enhancement, stating that the recorded prison calls "sufficiently documented that he [Williams] wanted his family to get through to Ms. Loud that she should not be testifying," and his "attitude" toward Whitfield was "adequately documented on the record." Though Williams denies that he threatened any of his co-defendants, the recorded conversations support the Court's finding that Williams attempted to "unlawfully influence" co-defendant Loud so as to dissuade her from testifying against

34

him.  The Court did not err by applying a two-level enhancement for obstruction of justice.

### 3.  The Criminal History Calculation Was Correct.

The Probation Office assigned three criminal history points for Williams' 2010 New Jersey fraud conviction.  The indictment in the New Jersey case charged that between December 2006 and June 2007, Williams and others fraudulently obtained credit card account information, used the information to add themselves to the accounts, and then used the account numbers to obtain cash and merchandise.  Williams pled guilty to the charges in August 2010 in the Superior Court of New Jersey in Atlantic County where the court sentenced him to a ten-year custodial term.

Williams objected to the assignment of any points on the ground that the conduct in that case was similar to the conduct in this case and that Whitfield also was involved in the New Jersey case.  Williams' counsel acknowledged, however, that the indictment in this case did not include the conduct charged in the New Jersey case, and that the crime involved a different time period and took place in a different jurisdiction.  When asked why it would be inappropriate to assess points for this conviction in light of these distinctions, counsel responded that it was "just very similar" and he had nothing else to add.  App. 2017.  The District Court correctly overruled the objection.  A defendant receives criminal history points for each prior sentence that was "for conduct not part of the instant offense."  U.S.S.G. § 4A1.2(a)(1).  "Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of section 1B1.3 (Relevant Conduct)."  U.S.S.G.  § 4A1.2 app. note 1.  As Williams'

35

counsel acknowledged, the New Jersey conduct was not charged in this case, nor was it treated as relevant conduct, but was a separate scheme committed in a different jurisdiction and time frame. Consequently, the Court did not commit an error in its treatment of the New Jersey conviction.

## VI.    CONCLUSION

In our concluding we make a final point. We have considered much of this appeal on a plain error basis because Williams did not preserve all of his issues in the District Court but even if he had done so and we could have considered them without invoking that demanding standard of review, our result would not have been different. That said, we will affirm the judgment of conviction and sentence entered on April 25, 2013, in the District Court on all counts.